# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AUGME TECHNOLOGIES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 11-379-LPS |
| | ) |
| PANDORA MEDIA, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DEFENDANT PANDORA MEDIA INC.'S
## OPENING BRIEF ON CLAIM CONSTRUCTION

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com
jtigan@mnat.com

OF COUNSEL:                    *Attorneys for Defendant*

Matthew P. Becker
Richard S. Stockton
Azuka C. Dike
BANNER & WITCOFF, LTD.
Ten South Wacker Drive
Suite 3000
Chicago, IL  60606-7407
(312) 463-5000

January 6, 2012

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     THE PATENT-IN-SUIT.........................................................................................1

III.    LEGAL FRAMEWORK FOR CLAIM CONSTRUCTION .............................................4

IV.     CLAIM CONSTRUCTION OF THE '690 PATENT .......................................................5

   A.   "media appliance metaphor"...........................................................................6

   B.   "Web page" ......................................................................................................7

   C.   "adding a media function to a Web Page" ....................................................10

   D.   "processor platform" .....................................................................................11

   E.   "a software device of a graphic representation representing a real world
        counterpart for display in connection with said Web page" ....................................13

   F.   "server system" .............................................................................................14

   G.   "formed by a server system as a service response in response to
        information provided by said processor platform to said server system"................................15

   H.   "automatically provided" ..............................................................................18

   I.   "customized by said server system in accordance with information content
        of said Web page"..........................................................................................19

V.      CONCLUSION ....................................................................................................20

# TABLE OF AUTHORITIES

*Abbott Labs. v. Andrx Pharms., Inc.,*
  473 F.3d 1196 (Fed. Cir. 2007) ...............................................................................19

*Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.,*
  265 F.3d 1294 (Fed. Cir. 2001) ...............................................................................17

*Alloc, Inc. v. Int'l Trade Comm'n,*
  342 F.3d 1361 (Fed Cir. 2003) ................................................................................12

*Biogen, Inc. v. Berlax Labs., Inc.,*
  318 F.3d 1132 (Fed. Cir. 2003) ............................................................ 7, 12, 17, 20

*CollegeNet, Inc. v. ApplyYourself, Inc.,*
  418 F.3d 1225 (Fed. Cir. 2005) ...............................................................................19

*Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.,*
  868 F.2d 1251 (Fed. Cir. 1989). ................................................................................4

*Cybor Corp. v. FAS Techs., Inc.,*
  138 F.3d 1448 (Fed. Cir. 1998) .................................................................................4

*Dow Jones & Co. v. Ablaise Ltd.,*
  606 F.3d 1338 (Fed. Cir. 2010) .................................................................................8

*Edward Lifesciences LLC v. Cook Inc.,*
  582 F.3d 1322 (Fed. Cir. 2009) ...............................................................................10

*Goldenberg v. Cytogen, Inc.,*
  373 F.3d 1158 (Fed. Cir. 2004) ...............................................................................12

*Laitram Corp. v. Morehouse Indus., Inc.,*
  143 F.3d 1456 (Fed. Cir. 1988). ................................................................................5

*Markman v. Westview Instruments, Inc.,*
  52 F.3d 967 (Fed. Cir. 1995) .....................................................................................5

*Marteck Biosciences Corp. v. Nutrinova, Inc.,*
  579 F.3d 1363 (Fed. Cir 2009) ................................................................................20

*Netword, LLC v. Centraal Corp.,*
  242 F.3d 1347 (Fed. Cir. 2001) .......................................................................7, 12, 17

*Nystrom v. Trex Co.,*
  424 F.3d 1136 (Fed. Cir. 2005). ................................................................................4

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
  521 F.3d 1351 (Fed. Cir. 2008) ............................................................................ 7, 13, 14, 18

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  487 F.3d 701 (9th Cir. 2007) ................................................................................................9

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ..................................................................... 4, 5, 20

*Renishaw PLC v. Marposs Societa' per Azioni,*
  158 F.3d 1243 (Fed. Cir. 1998) .............................................................................................5

*Retail Services Inc. v. Freebies Publishing*,
  364 F3d 535 (4th Cir. 2004) ..................................................................................................8

*Simplification LLC v. Block Financial Corp.,*
  593 F. Supp. 2d 700 (D. Del. 2009) ......................................................................................19

*Sinorgchem Co. v. Int'l Trade Commission,*
  511 F.3d 1132 (Fed. Cir. 2007) ...........................................................................................19

*Verizon Services Corp. v. Vonage Holdings Corp.,*
  503 F.3d 1295 (Fed. Cir. 2007) .............................................................................................8

*Wang Labs., Inc. v. Am. Online, Inc.,*
  197 F.3d 1377 (Fed. Cir. 1999) .............................................................................................9

I.     **INTRODUCTION**

Defendant Pandora Media, Inc. ("Pandora") submits this brief in support of its proposed construction of disputed claim terms in U.S. Patent No. 7,831,690 to McCollum et al. (Ex. A, "'690 patent") – the sole patent in suit.

As indicated in the parties Joint Claim Construction Statement [D.I. 20], the parties have identified a number of disputed terms and phrases from the asserted patent claims that require interpretation by the Court.

For each of the disputed claim terms, Pandora has proposed a construction guided by basic claim construction principles to achieve the dual goals of explaining and clarifying for the jury the meaning of the claim term in dispute, while being true to the scope of the claimed invention.  In contrast, Augme's proposed construction ignores the ordinary meaning of claim terms or seeks to broaden the claims divorced from the invention.  Ultimately, the intrinsic and extrinsic evidence and the rules of claim construction fully support Pandora's proposed construction.  For the reasons set forth below, Pandora respectfully requests the Court to adopt Pandora's proposed constructions, and to reject Augme's improperly expansive definitions.

II.    **THE PATENT-IN-SUIT**

The '690 patent is directed to a "media appliance metaphor" software program that is created by a server system and that adds a "media function" to a Web Page downloaded at a client-side computer.  Web pages are documents written in HyperText Markup Language (HTML) and are viewed in Web browsers.  '690 patent, at 1:67-2:3; 2:26-34.  As set forth in the background section of the '690 patent, Web site developers utilized "affiliate programs" to add functionality to a Web page.  *Id.* at 2:1-6.  To obtain and execute the affiliate programs in connection with a Web site, a developer may have been required to register with the supplier of

1

the program.  *Id.* at 2:6-10.  However, this registration process was lengthy and cumbersome for

the developer.  *Id.* at 2:10-12.  Moreover, even if developers successfully managed to register,

they had to then wait to receive the implementing code for the affiliate program from the

supplier.  *Id.* at 2:15-21.  In addition, the affiliate program code was not universally compatible

with Web browsers and thus visitors to a Web site may not have been able to experience the

added functionality.  *Id.* at 2:22-29.

   The invention described and claimed in the '690 patent was intended to address

these problems with so-called third-party affiliate programs.  The '690 patent generally teaches a

two-code-module system to automatically generate software code that is assembled by a server

system and sent to a user's computer (*i.e.* processor platform).  Specifically, when a client

computer downloads a Web page using a web browser, the browser automatically executes a first

code module embedded in the Web page.  *See* Figure 3 (tasks 112-114); 6:13-23.  The first code

module issues a first command to retrieve a second code module, via a network connection, from

a server system.  '690 patent, at 6:24-28.  The client computer communicates the Web address

for the downloaded Web page to the server system along with information about the user's

computer system (*i.e.* "processor platform information") and its web browser ("browser

information").  *See* Figure 3 (tasks 118 and 120); 6:29-37.

   The server system uses the web address, processor platform information and Web

address information to create the second code module, which includes the software code for the

media appliance metaphor and its associated service response.  Figure 5 is a flow chart depicting

the steps the server system follows to create the second code module.  The server system uses the

web address information to create a profile for the Web page used to determine a service

response.  *See* Figure 6; 7:43-51.  The server extracts information content from a Web page,

2

which includes all publicly accessible characters and words written on a Web page, such as

HTML tags embedded in a Web page.  '690 patent, at 7:26-39.  The server system then

determines the proper service response for the Web page and stores the web address (by its

Uniform Resource Locator ("URL")) and service response in a web address database as

illustrated below in Figure 7:

| WEB ADDRESS FIELD | PROFILE FIELD | SERVICE RESPONSE 162 FIELD | PARAMETER SET FIELD |
|---|---|---|---|
| URL 1 160 | RECREATION/ GOLF | DENIAL OF 176 SERVICE | DENIAL CONTENT |
| URL 2 174 | TEXAS COOKING | CONDITIONAL 186 SERVICE | CONDITIONAL CONTENT (INCLUDING URL 5) |
| URL 3 184 | WEDDING | PREDETERMINED 186 SERVICE | PREDETERMINED CONTENT |
| URL 4 | FOOTBALL 234 176 | PREDETERMINED SERVICE (FLAG- CONDITIONAL SERVICE FOR TRACKING INDEX 60) | PREDETERMINED CONTENT 236 |
| ⋮ | | ⋮ | |
| URL n | | · | |

Figure 7 shows profiles for four different web addresses (URL 1-4), the profile for

each web page (*e.g.,* Recreation/Golf, Texas Cooking, Wedding, Football) and the service

response for each web page (*e.g.* denial of service, conditional service, etc.).  For example, the

service response for the Web page related to Texas Cooking may be a "media appliance

metaphor" presenting a radio image that plays a country radio channel.  '690 patent, at 12:54-61.

The server system also uses the browser information and processor platform information to

populate a visitor database, illustrated in Figure 9.  *Id.* at 9:44-52; 10:19-35.

Next, the server system assembles the second code module using data contained

in the web address database and browser and platform information maintained in the visitor

database.  *Id.* at 11:61-12:1.  Because the second code module is assembled in response to

3

browser information and platform information, it will be compatible with the Web browser used by the client's processor platform and solves compatibility issues related to the use of prior art affiliate programs. *Id.* at 12:5-10.

## III.  LEGAL FRAMEWORK FOR CLAIM CONSTRUCTION

Claim construction is the first step in a patent infringement analysis, and involves the court's determination of the meaning and scope of the asserted patent claims. *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (*en banc*). Patent claims describe the invention and set forth the metes and bounds of the patent. *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.,* 868 F.2d 1251, 1257-58 (Fed. Cir. 1989).

In *Phillips*, the *en banc* Federal Circuit reaffirmed the controlling legal principle that claim language cannot be construed as if quarantined from the rest of the patent: "The claims, of course, do not stand alone.  Rather, they are part of a 'fully integrated written instrument,' consisting principally of a specification that concludes with the claims." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc).  "For that reason, claims must be read in view of the specification, of which they are apart." *Id.*  "The best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history." *Id.* at 1315.

The prosecution history is also an important source for determining the meaning of claim terms because, "like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Id.* at 1317.  "Broadening of the ordinary meaning of a term in the absence of support in the intrinsic record indicating that such a broad meaning was intended violates the principles articulated in *Phillips*." *Nystrom v. Trex Co.*, 424 F.3d 1136, 1145-46 (Fed. Cir. 2005).

Courts may also use extrinsic evidence in construing claim terms if it is necessary, so long as such evidence is not used to "enlarge, diminish, or vary the limitations in the claims." *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 980 (Fed. Cir. 1995).  Although extrinsic evidence "can shed useful light on the relevant art," the Federal Circuit has explained that such evidence is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'"  *Phillips,* 415 F.3d at 1317 (citations omitted).  "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."  *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

## IV.   CLAIM CONSTRUCTION OF THE '690 PATENT

As noted above, the '690 Patent generally relates to a "media appliance metaphor" software program created by a server system in response to browser and processor platform information, and "information content" from the Web page downloaded at the client. There are 9 terms in the '690 patent that require construction, all which appear in claim 1.  To put these terms into context, claim 1 is reproduced below with the disputed phrases highlighted.

> 1. A media appliance metaphor residing in non-transitory memory for adding a media function to a Web page down-loaded at a processor platform, said metaphor executable by said processor platform, and comprising a software device of a graphic representation representing a real world counterpart for display in connection with said Web page, wherein said metaphor is:
>
> formed by a server system as a service response in response to information provided by said processor platform to said server system;
>
> automatically provided from said server system when said Web page is downloaded at said processor platform;
>
> customized by said server system in accordance with infor-mation content of said Web page.

A.    "media appliance metaphor"

| Pandora's Proposed Construction | Augme's Proposed Construction |
|---|---|
| "a software device that exists in the realm of electronic communication and has a physical counterpart object in the real world that can be manipulated on the display screen in the same manner that the physical object is manipulated in the real world" | "a software device that exists in the realm of electronic communication and has a counterpart in the real world" |

Pandora's proposed construction, requiring a physical counterpart object that can be manipulated on the display screen in the same manner as in the real world, is based on repeated explanations in the specification of the specific form of software device invented. For example, the inventors explain that when displayed in connection with a Web page, a "media appliance metaphor is a graphic representation of something that ***looks and behaves*** like a media appliance." '690 patent, at 5:52-55 (emphasis added).

Augme's proposed construction – which does not require a physical counterpart in the real world – is wrong because nothing in the written description suggests that the real world counterpart of a media appliance metaphor includes intangible (i.e. non-physical) objects. The patent only contemplates media appliance metaphors corresponding to physical objects existing in the real world, including "a radio image … television images, computer images, computer game toy images, and so forth." *Id.* at 5:57-59. These examples comport with the dual-nature of the media appliance metaphor and its physical, real world counterpart object: "When applied to a Web page, media appliance metaphor gives the visitor to Web page the impression that they already know how to use the device because it looks and acts like something they are already familiar with." *Id.* at 5:59-63.

Thus, Pandora's construction of "media appliance metaphor" is correct because it conforms with the description of the invention in the specification, and should be adopted. *See*

*Biogen, Inc. v. Berlax Labs., Inc.,* 318 F.3d 1132, 1139-1140 (Fed. Cir. 2003) (affirming construction that "conform[ed] with the basis on which the invention was presented in the specification"); *Netword, LLC v. Centraal Corp.,* 242 F.3d 1347, 1352 (Fed. Cir. 2001) (patent claims cannot "enlarge what is patented beyond what the inventor has described as the invention.")

### B.    "Web page"

| Pandora's Proposed Construction | Augme's Proposed Construction |
|---|---|
| "a document generated in HyperText Markup Language (HTML) that is accessed through a web browser and displayed by a web browser" | This term does not require construction beyond its plain and ordinary meaning.  To the extent, however, that the Court finds a construction would be helpful to the jury or otherwise finds that the term requires construction, Augme proposes:<br><br>"a document or information resource associated with a URL that may be downloaded or accessed from the World Wide Web" |

Augme's suggested reliance on the "plain and ordinary meaning" of this claim term is misplaced because it does not resolve the parties apparent dispute as to the term's meaning and scope.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1361-62 (Fed. Cir. 2008) (explaining that even when parties assign alleged "ordinary meaning" to claim terms, the district court must still construe the terms if they are in dispute).  Thus, the Court must construe this disputed limitation.

Pandora's and Augme's proposed constructions differ, principally, with regards to the scope of the term "Web page."  Pandora's proposed construction is supported by the intrinsic evidence and ordinary meaning of "Web page," while Augme's construction is overbroad and seeks to ignore fundamental features of the invention as disclosed in the specification.

The '690 patent specification makes clear that a Web page "is generated in a HyperText Markup Language (HTML).  HTML is the authoring software language used on the Internet's World Wide Web for creating Web pages."  *Id.* at 3:66-4:3; *see also* 2:59-61 ("The code module is configured to be embedded in the Web page which is generated in a HyperText Markup Language (HTML).").   The remainder of the specification reinforces Pandora's construction that a Web page is an HTML document.  For example, the specification states: "the ***present invention*** teaches of a method and system for adding function … through the implementation of a simple code module embedded in the HTML of the Web page."  *Id.* at 14:12-16 (emphasis added).  Information content of the Web page may be found in "HTML tags."  *Id.* at 7:31-34.  Thus, the invention is described in terms of a Web page being an HTML document, which limits the scope of the invention to that description.  *See e.g. Verizon Services Corp. v. Vonage Holdings Corp.,* 503 F.3d 1295, 1308 (Fed. Cir. 2007) ("When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention.").

The specification is consistent with the ordinary meaning of Web page.  *See Microsoft Press Computer Dictionary* 506 (3d ed. 1997) ("A document on the World Wide Web . . . consist[ing] of an HTML file, with associated files for graphics and scripts, in a particular directory on a particular machine.").   Courts routinely describe Web pages as an HTML document. *See Dow Jones & Co. v. Ablaise Ltd.*, 606 F.3d 1338, 1340 (Fed. Cir. 2010) ("HTML is a language embodying sets of instructions that control the format of a Web page displayed on the browser application of a user's PC."); *Retail Services Inc. v. Freebies Publishing*, 364 F3d 535, 541 n.1 (4th Cir. 2004) ("An Internet web page is essentially a "computer data file[] written in Hypertext Markup Language (HTML) — which contain[s] information such as text, pictures,

sounds, audio and video recordings, and links to other web pages."); *Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 711 (9th Cir. 2007) (A webpage consists of text interspersed with instructions written in Hypertext Markup Language ("HTML") …").[1]

The specification also explains that a Web page "is downloaded to a client machine supporting a graphical user interface and a Web browser." *Id.* at 2:60-64. As demonstrated in Figure 4 to the right, the invention utilizes a Web browser, such as Internet Explorer 3.0, to access and display the Web page. *Id.* at 4:33-36.



FIG. 4

Augme's proposed construction of "Web page" is overly broad and contrary to the intrinsic evidence. First, and most significantly, Augme's proposed construction disregards that a Web page includes an HTML document. As previously discussed, the '690 patent consistently states that a Web page is generated in HTML, and not some other authoring language. '690 patent, 14:12-16. By reading out the requirement that a Web page is "generated in HTML," Augme's proposed construction is not even consistent with the "plain and ordinary" meaning of the term.

---

[1]      Pandora's construction is correct even if a Web page is not generated by HTML because that is all the patent describes. *See, e.g., Wang Labs., Inc. v. Am. Online, Inc.*, 197 F.3d 1377, 1382 (Fed. Cir. 1999) (limiting the claim term "frame" to character-based protocol, even though "frame," used generally, could also refer to bit-mapped displays, because the specification described only systems using character-based protocol).

Second, Augme's construction fails to address the requirement of a web browser downloading and accessing the Web page to execute the embedded code module, as expressly set forth in the specification.   '690 patent, at 6:13-23; *see also* 12:45-46 ("Task 248 causes Web browser to execute second code module.").   Thus, there is no basis to broaden the term as Augme proposes.

### C.      "adding a media function to a Web Page"

| Pandora's Proposed Construction | Augme's Proposed Construction |
|---|---|
| adding a software program to a Web page that adds media content to the Web page | providing audio, video and/or graphic content (i.e. a media function) to a Web page. |

The parties' dispute with respect to this term primarily concerns the scope of the limitation "adding a media function to a web page."   Pandora's proposed construction is supported by the specification, which explicitly equates "adding a media function to a Web page" with adding a software program to a web page. *Id.* at 5:45-49; 7:54-58; 10:54-57; 14:12-16.   Indeed, the central focus of the '690 patent is creating a second code module (a software program) that adds media functionality to a Web page.   For example, in the background section of the specification, the patentees indicate that "a typical example of adding function to a Web site is the addition of an affiliate program," which is a software program. *Id.* at 2:1-2; 2:15-21. Moreover, discussion of adding function in the specification is directed to presenting a Web page with the added function of a media appliance metaphor, which is configured to be embedded in the HTML of the Web page. *Id.* at 5:45-49; 14:12-16.   The term "added function" is consistently used throughout the specification to describe a software program that adds a media function to a Web page.   For example, the specification expressly states:   "Processor may determine that Web page is objectionable or otherwise unacceptable to be displayed with added function, ***i.e. media appliance metaphor***." *Id.* at 7:54-58 (emphasis added); *see also Edward Lifesciences LLC v.*

10

*Cook Inc.,* 582 F.3d 1322, 1334 (Fed. Cir. 2009) (ruling that "specification's use of 'i.e.' signals an intent to define the word to which it refers").

Augme's proposed construction incorrectly equates "adding" a media function with simply providing audio, video, or graphic content to a Web page.  The inventors did not use the phrase "adding a media content," but instead used "adding a media function," and the examples in the specification all envision some functionality more than just content.  In fact, the Web page to which a "media function" is added already has content.  *See e.g.* '690 patent*,* at 7:9-13.  By expressly equating a media appliance metaphor to added function, the '690 patent requires any added media function to be more than simply content.

**D.    "processor platform"**

| Pandora's Proposed Construction | Augme's Proposed Construction |
|---|---|
| "a networked client-side (i.e. end user) computer device having a processor, memory, including a non-transitory memory, input/output lines, a Web browser and a display device" | This term does not require construction beyond its plain and ordinary meaning.  To the extent, however, that the Court finds a construction would be helpful to the jury or otherwise finds that the term requires construction, Augme proposes:<br><br>"a networked computing device that includes a central processing unit (CPU), memory, and communications ports" |

The claims and specification of the '690 patent make absolutely clear that a "processor platform" is a client side computer device.   Specifically, claim 1 includes the limitations of "a Web page downloaded at a processor platform" and a media appliance metaphor formed "in response to information provided by said processor platform."  Because a Web page is downloaded on the client side, and a "media appliance metaphor" is formed on the client side, by the very words of the claim, the "processor platform" is on the client side.  Likewise, the specification envisions the processor platform as being a "client machine" operated by the end

user.  *Id.* at 2:62-64 ("The code module . . . is configured for automatic execution when the Web page is downloaded to a client machine supporting a graphical user interface and a Web browser."); 2:43-45 ("It is yet another advantage of the ***present invention*** that a method and system are provided that deliver services by client demand") (emphasis added); *see e.g.,* 2:64-3:1; 10:52-56; 12:13:30-33; 13:38-39.

Furthermore, "processor platform" is an ambiguous term that does not have an understood "ordinary meaning" in the art, and thus use of the term in the specification must govern.  *See Goldenberg v. Cytogen, Inc.,* 373 F.3d 1158, 1164 (Fed. Cir. 2004) (holding that "where a claim term has no ordinary and customary meaning, court must resort to the remaining intrinsic evidence … to obtain the meaning of that term").  Here, the inventors clearly expressed that a "processor platform" includes "a display device," "a memory," "Web browser software and a temporary memory."  '690 patent, at 4:13-17.  These features that define the "processor platform," absent from Augme's construction, are fundamental to the entire character of the invention claimed in the '690 patent.  *See Alloc, Inc. v. Int'l Trade Comm'n,* 342 F.3d 1361, 1370 (Fed Cir. 2003) (instructing court to "look[] to whether the specification refers to a limitation only as part of less than all possible embodiments or whether the specification read as a whole suggests that the very character of the intention requires the limitation be a part of every embodiment").  Notably, a "display device" and a "web browser" are required in every embodiment of the alleged invention, thus Pandora's construction is correct.  *Id*; *see also Biogen,* 318 F.3d at 1139-40; *Netword*, 242 F.3d at 1352.

Augme's construction of "processor platform" is overly broad because it would permit the "processor platform" to be located on the server side.  Nothing in the intrinsic evidence supports such a broad construction.  Furthermore, Augme's proposed construction is

inconsistent with the specification because it includes "communication ports" as a component of the processor platform, when the intrinsic evidence associates "ports" with the server system. *See* Figure 1 (element 78); '690 patent, at 4:49-54 ("Ports 78 are in communication with server structure 72 and Internet 28 …").

For the foregoing reasons, the Court should adopt Pandora's construction for "processor platform."

### E.   "a software device of a graphic representation representing a real world counterpart for display in connection with said Web page"

| Pandora's Proposed Construction | Augme's Proposed Construction |
|---|---|
| a computer module that when executed results in a Web page displaying a graphic representation of a real world counterpart media device | This phrase as a whole does not require construction beyond its plain and ordinary meaning. Augme has provided a proposed construction for the term "Web page" that appears in the phrase |

Augme's suggested reliance on the "plain and ordinary meaning" does not resolve the parties' dispute as to the term's meaning and scope. *See O2 Micro,* 521 F.3d at 1361-62. Here, the dispute centers on whether the media appliance metaphor is displayed in a Web page when executed. The express teachings of the '690 patent makes clear that upon the execution of second code module, the media appliance metaphor is applied to the Web page for display:

> Task 248 causes Web browser to execute second code module 90. In response to task 248, a task 250 is performed. Task 250 causes media appliance metaphor 111 (FIG.4) to be applied to Web page 34 for display at display device 48 (FIG. 1).

'690 patent, 12:45-49; *see* Figure 4; *see also* 5:20-52 ("Media appliance metaphor is a software device … and has a counterpart in the real world."). Significantly, the Web page does not display the media appliance metaphor until the second code module is *executed. Id.* (emphasis added). For example, in Figure 3 of the '690 patent, which shows a flow chart of the Web page

display process, the step of executing the second code module (element 248) is shown to occur

prior to the display of media appliance metaphor (element 250).

By contrast, Augme's general application of the label "plain and ordinary"

meaning" fails to provide any context or scope for the disputed phrase in view of the '690 patent.

Therefore, based on the above discussion, the Court should adopt Pandora's proposed

construction.

F.    "server system"

| Pandora's Proposed Construction | Augme's Proposed Construction |
|---|---|
| a processor (CPU), a memory, a database structure having Web address database and visitor database, and a server structure for accommodating streaming media servers and other media servers | This term does not require construction beyond its plain and ordinary meaning. To the extent, however, that the Court finds a construction would be helpful to the jury or otherwise finds that the term requires construction, Augme proposes:<br><br> a system having one or more computing devices and one or more databases that is connected to a network and that responds to requests from client computers on the network |

The Court must construe this limitation because its meaning is disputed by the

parties.  *See O2 Micro,* 521 F.3d at 1361-62.

Pandora's construction of "server system" is supported by the intrinsic evidence.

The specification of the '690 patent discloses that a "server system" includes "a processor

(CPU), a memory, a database structure having Web address database and visitor database, and a

server structure for accommodating streaming media servers and other media servers."  '690

patent, at 4:45-48; *see also* Figure 1.  As explained above, the server system assembles the code

for the media appliance metaphor using the web address database and processor and platform

information contained in the visitor database.  *See id.* at 7:43-51; 11:61-12:1;  *see also* Figure 6.

Thus, each of these components is a fundamental aspect of the server system used to create the code for the media appliance metaphor contemplated by the inventors.

In contrast, Augme has proposed a construction that unduly broadens the scope of the claimed invention.  By ignoring several of the features of the "server system," such as the web address database that is used to generate an appropriate service response or the visitor database that "store[s] browser and platform information" also used to generate a service response, *see id.* at 10:19-22, Augme seeks to construe the term "server system" to broadly mean any system of computing devices and databases connected to a network.  This is an improper attempt by Augme to capture subject matter that was never claimed during prosecution of the '690 patent.

For the foregoing reasons, the Court should adopt Pandora's proposed construction for the term "server system."

G.    **"formed by a server system as a service response in response to information provided by said processor platform to said server system"**

| Pandora's Proposed Construction | Augme's Proposed Construction |
|---|---|
| the processor platform provides (i) the web address of the downloaded web page, (ii) web browser information, and (iii) processor platform information to the server system which uses this information to assemble software code that includes the service response | This phrase as a whole does not require construction beyond its plain and ordinary meaning. Augme has provided a proposed construction for the terms "server system," "service response," and "processor platform" that appear in the phrase. |

Claim 1 of the '690 patent specifically states that a media appliance metaphor is "formed … in response to information provided by said processor platform."  The '690 patent also explains that the client-side computer provides three specific pieces of information to the server system, and the server system uses that information to form the software code for the media appliance metaphor.  Figure 3 is a flow chart of a Web page display process running on

the client computer and Figure 5 is a flow chart describing the assembly of the code for the service response of the media appliance metaphor.



Figure 3

Figure 5

The information communicated from the client computer is a Web address and browser and platform information. *See* Figure 3. Similarly, the server receives the web address, browser and platform information to assemble the code for the media appliance metaphor. *See* Figure 5. This is confirmed by the written description. *See, e.g.,* '690 patent, at 11:67 – 12:1 ("[S]econd code module is assembled in response to browser information and platform information."); 6:29-31 ("Task 118 causes second processor platform to communicate Web address to server system through the execution of first command line"); *see also* Figure 3 (element 118, 120); Figure 5 (element 126, 190). These pieces of information are required to customize the media appliance metaphor based on the information content of the Web page, and to provide a code module that is compatible with the client's Web browser and processor platform. *See e.g.* '690 patent, at 12:7-10. In fact, these are essential features of the claimed invention used to overcome perceived problems in the prior art with compatibility between Web browsers and enhanced function provided by the affiliate programs. *Id.* at 2:22-24; *see also* 12:2-4 ("second code module is assembled to include the service response and to work with

any combination of browser/platform systems."); 2:36-38 ("It is another advantage of the ***present invention*** that a method and system are provided that are compatible with Web browsers") (emphasis added). In contrast, other information that may be provided to the server system is not required to form the second code module, such as "optional visitor specified parameters." *Id.* at 10:35-38; *see also* Figure 5 (task 230 optional). Thus, Pandora's construction is correct. *See Biogen,* 318 F.3d at 1139-1140; *Netword,* 242 F.3d at 1352.

Furthermore, the server system must not only receive the aforementioned information from the client computer, but the server system must use it to form the code for the service response, as made clear by the specification. During prosecution of the related '636 patent, the patentees distinguished a prior art reference (Davis) that could obtain information about a client's browser but did not use this information to assemble code. [D.I. No. 37-11, at AT0205501-02]. The inventors argued that Davis, therefore, did not disclose a limitation requiring "assembling said second code module ***in response*** to said information":

> The Davis CGI script executed at the server can collect information from the client such as browser type .... However, this information does not influence the Davis JAVA applet program. That is, a conventional JAVA applet is not assembled in response to information characterizing the client machine and/or Web browser. ... However, ... the received information characterizing at least one of the processor platform and the Web browser is not merely used to identify the web user. Rather, the information is used to render the second code module ..., i.e. "assembling said second code module in response to said information."

*Id.* (emphasis added). The patentees unmistakably intended the limitations identified in Pandora's construction to be essential features of the present invention. Nevertheless, Augme's proposed construction now seeks to improperly disregard the prosecution history. *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.,* 265 F.3d 1294, 1305 (Fed. Cir. 2001) ("The prosecution history of a related patent can be relevant if, for example, it addresses a limitation in common with the patent in suit.").

Because Augme's construction fails to include essential limitations of the invention, and is contrary to representations made by Augme during prosecution, Pandora's proposed construction should be adopted.

### H.  "automatically provided"

| Pandora's Proposed Construction | Augme's Proposed Construction |
|---|---|
| provided from the server system without any action by the user | This term does not require construction beyond its plain and ordinary meaning. |

Again, the Court must construe this limitation because its meaning is disputed by the parties. *See O2 Micro,* 521 F.3d at 1361-62.

The context of "automatically provided" in claim 1 is "[a media appliance metaphor] wherein said metaphor is … automatically provided from said server system when said Web page is downloaded at said processor platform."  Pandora's construction of "automatically provided" is consistent with the specification and claim language of the '690 patent.

The specification of the '690 patent explains that "[w]hen the Web page is downloaded, automatically executing a first code module embedded in the Web page.  The first code module issues a first command to retrieve a second code module … [and] issues a second command to initiate execution of the second code module."  '690 patent, at 2:50-55; *see also* 2:59-64; 6:19-23.  Nowhere in the specification does the '690 patent teach that user action is required for the server system to provide a media appliance metaphor after the Web page has been downloaded.  Rather, as explained above, the specification teaches that the media appliance metaphor is applied to the Web page following the "automatic" execution of the first and second code modules.

Moreover, given the plain and ordinary meaning of "automatic" and because the language of claim 1 expressly states "automatically provided," it necessarily follows that the media appliance metaphor is "automatically provided" from the server system without any action by the user. *See Simplification LLC v. Block Financial Corp.,* 593 F.Supp.2d 700, 708 (D. Del. 2009) (construing the term "automatic" to mean "without manual intervention from the user" (citing *CollegeNet, Inc. v. ApplyYourself, Inc.,* 418 F.3d 1225, 1235 (Fed. Cir. 2005)).

Based on the above discussion, the Pandora's proposed construction should be adopted.

## I.    "customized by said server system in accordance with information content of said Web page"

| Pandora's Proposed Construction | Augme's Proposed Construction |
|---|---|
| the server uses information derived from all publically accessible characters and words written on a Web page to customize the media appliance metaphor | This term does not require construction beyond its plain and ordinary meaning. To the extent, however, that the Court finds a construction would be helpful to the jury or otherwise finds that the term requires construction, Augme proposes:<br><br>"tailored by the server system (as construed) to complement or relate to data contained in or otherwise associated with Web page (as construed)." |

Pandora and Augme's proposed constructions differ with regards to the scope of the limitation "information content of said Web page." Pandora's proposed construction is consistent with the intrinsic evidence. Here, the patentees acted as their own lexicographers when defining the term "information content," which does not have a standardized meaning in the art. The specification expressly states: "The information content of Web page *is* derived from all characters and words that are written on Web page, and that are publically accessible." '690 patent, at 7:29-31 (emphasis added). The word "is," signifies that the patentees acted as

their own lexicographer and defined the term. *Abbott Labs. v. Andrx Pharms., Inc.,* 473 F.3d 1196, 1210 (Fed. Cir. 2007); *see also Sinorgchem Co. v. Int'l Trade Commission,* 511 F.3d 1132, 1136 (Fed. Cir. 2007) (definition assigned by the inventor in the specification governed claim construction). Even if not an express definition, the written description provides persuasive evidence of what the inventors meant by "information content" and their description supports definition Pandora's construction. *See Biogen,* 318 F.3d at 1139-1140.

In contrast, Augme's proposed construction of "information content" is overly broad and inconsistent with the intrinsic evidence. Augme's construction disregards the patentee's express definition of "information content," and improperly seeks to broaden the scope of the claim term to include any "data contained in or otherwise associated with a Web page." But Augme must be bound by the express definition and use of the term delineated in the specification. *See Marteck Biosciences Corp. v. Nutrinova, Inc.,* 579 F.3d 1363, 1380 (Fed. Cir 2009) ("When a patentee explicitly defines a claim term in the patent specification, the patentee's definition controls." (citing *Phillips*, 415 F.3d at 1321)). Consequently, the Court should adopt Pandora's proposed constructions for these terms.

## V.     <u>CONCLUSION</u>

For the foregoing reasons, Pandora respectfully requests that the Court adopt Pandora's proposed claim constructions.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

_____

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com
jtigan@mnat.com

*Attorneys for Defendant*

OF COUNSEL:

Matthew P. Becker
Richard S. Stockton
Azuka C. Dike
BANNER & WITCOFF, LTD.
Ten South Wacker Drive, Suite 3000
Chicago, IL  60606-7407
(312) 463-5000

January 6, 2012

4813335.1

## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2012, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on January 6, 2012, upon the following in the manner indicated:

Edmond D. Johnson, Esquire                    *VIA ELECTRONIC MAIL*
James G. McMillan, III, Esquire
PEPPER HAMILTON LLP
1313 Market Street
Suite 5100
Wilmington, DE  19801

Thomas J. Scott, Jr., Esquire                 *VIA ELECTRONIC MAIL*
Jennifer A. Albert, Esquire
GOODWIN PROCTER LLP
901 New York Avenue NW
Washington, DC  20001

Ankur P. Parekh, Esquire                      *VIA ELECTRONIC MAIL*
GOODWIN PROCTER, LLP
620 Eighth Avenue
New York, NY  10018-1405


                                              */s/ Rodger D. Smith II*

                                              _____
                                              Rodger D. Smith II (#3778)