AUGME TECHNOLOGIES, INC.,

        Plaintiff,

        v.

PANDORA MEDIA, INC.,

        Defendant.

Civil Action No. 11-379-LPS

## PLAINTIFF AUGME TECHNOLOGIES, INC.'S
## OPENING CLAIM CONSTRUCTION BRIEF

s/ *Edmond D. Johnson*
Edmond D. Johnson (Del. Bar No. 2257)
James G. McMillan, III (Del. Bar No. 3979)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Tel.: (302) 777-6500
Fax.: (302)421-8390
*johnsone@pepperlaw.com*
*mcmillanj@pepperlaw.com*

Of Counsel:

Thomas J. Scott, Jr.
Jennifer A. Albert
GOODWIN PROCTER LLP
901 New York Avenue NW
Washington, DC 20001
Tel.: (202) 346-4000
Fax: (202) 346-4444
*jalbert@goodwinprocter.com*
*tscott@goodwinprocter.com*

Ankur P. Parekh
GOODWIN PROCTER, LLP
620 Eighth Avenue
New York, NY 10018-1405
Tel.: (212) 813-8800
Fax: (212) 355-3333
*aparekh@goodwinprocter.com*

*Attorneys for Plaintiff Augme Technologies, Inc.*

Dated: January 6, 2012

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..........................................................................................1

II.    THE PATENTED TECHNOLOGY ...........................................................1

III.   LEGAL PRINCIPLES ...............................................................................3

IV.   ARGUMENT ...............................................................................................6

      1.     "media appliance metaphor".....................................................6

      2.     "Web page"..................................................................................7

      3.     "adding a media function to a Web page" ...............................9

      4.     "processor platform" ................................................................11

      5.     "a software device of a graphic representation representing a real world counterpart for display in connection with said Web page"...................................12

      6.     "server system" .........................................................................14

      7.     "formed by a server system as a service response in response to information provided by said processor platform to said server system"..............16

      8.     "automatically provided" .........................................................18

      9.     "customized by said server in accordance with information content of said Web page"...................................................18

V.     CONCLUSION............................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Acumed LLC v. Stryker Corp.*,
483 F.3d 800 (Fed. Cir. 2007)..............................................................................13

*Arlington Indus. v. Bridgeport Fittings, Inc.*,
632 F.3d 1246 (Fed. Cir. 2011)............................................................................4, 8

*Atser Research Techs., Inc. v. Raba-Kistner Consultants Inc.*,
No. SA-07-CA-93-H, 2009 U.S. Dist LEXIS 25294 (W.D. Tex. Feb. 27, 2009) ..................15

*CollegeNet, Inc., v. ApplyYourself, Inc.*,
418 F.3d 1225 (Fed. Cir. 2005)............................................................................18

*Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*,
34 F.3d 1048 (Fed. Cir. 1994)..............................................................................5

*Hewlett-Packard Co. v. Intergraph Corp.*,
No. C 03-2517 MJJ, 2004 U.S. Dist LEXIS 31073 (N.D. Cal., Dec. 20, 2004) .....................14

*Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*,
540 F.3d 1337 (Fed. Cir. 2008)............................................................................16

*In re Margolin*,
244 fed.Appx. 327, 2007 U.S.App. LEXIS 14269 (Fed. Cir. June 15, 2007) .......................15

*Kara Tech. Inc. v. Stamps.com Inc.*,
582 F.3d 1341 (Fed. Cir. 2009)............................................................................5, 15

*Linear Tech. Corp. v. Int'l Trade Comm'n*,
566 F.3d 1049 (Fed. Cir. 2009)............................................................................8

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996) ....................................3, 5

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
579 F.3d 1363 (Fed. Cir. 2009)............................................................................5, 16

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
474 F.3d 1323 (Fed. Cir. 2007)............................................................................7, 19

*Modavox, Inc. v. Tacoda, Inc.*,
No. 07cv07088(CM), 2011 U.S. Dist. LEXIS 133273 (S.D.N.Y Sept. 6, 2011) ....................10

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc).........................................................3, 4, 5

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
242 F.3d 1337 (Fed. Cir. 2001).........................................................................4

*Seven Networks Inc. v. Visto Corp.*,
No. 2:05-cv-365, 2006 U.S. Dist. LEXIS 93870 (E.D. Tex. Dec. 29, 2006) ..........................15

*Verizon Servs. Corp. v. Vonage Holdings Corp*,
503 F.3d 1295 (Fed. Cir. 2007).........................................................................14

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996).........................................................................3

*Voda v. Cordis Corp.*,
536 F.3d 1311 (Fed. Cir. 2008).........................................................................4

*Z4 Techs., Inc. v. Microsoft Corp.*,
507 F.3d 1340 (Fed. Cir. 2007).........................................................................18

## OTHER AUTHORITIES

Giles S. Rich, *The Extent of the Protection and Interpretation of Claims-American Perspectives*, 21 INT'L REV. INDUS. PROP. & COPYRIGHT L. (1990).........................................1

# TABLE OF EXHIBITS

| | |
|---|---|
| Exhibit 1 | U.S. Pat. No. 7,831,690 |
| Exhibit 2 | U.S. Pat. No. 7,269,636 |
| Exhibit 3 | U.S. Pat. No. 6,594,691 |
| Exhibit 4 | U.S. Pat. No. 7,783,721 |
| Exhibit 5 | Webopedia's definition of "Web page" |
| Exhibit 6 | Microsoft Computer Dictionary's definition of "server" |
| Exhibit 7 | McGraw-Hill Dictionary of Scientific and Technical Terms's definition of "server" |
| Exhibit 8 | Merriam Webster's definition of "automatic" |

# I.  INTRODUCTION

In 1990, Judge Giles Rich, then Chief Judge of the Federal Circuit, famously proclaimed that in patent law, "The name of the game is the claim."[1]  That a patentee's right to exclude is defined by the language of the patent claims has been a fundamental aspect of U.S. patent law for over 175 years.  Although a patent specification may describe specific embodiments of the patentee's invention, it does not define the metes and bounds of the patentee's exclusionary right.

In contravention of this principle, Defendant Pandora Media, Inc. ("Pandora") seeks with its constructions to limit the scope of the claims by importing features of exemplary embodiments of the inventions disclosed in the specification.  In some instances, Pandora's constructions are so narrow that they actually exclude other embodiments disclosed in the specification.  Pandora's motivation is clear; it seeks to manufacture non-infringement defenses through the claim construction process.  In contrast, Augme's proposed constructions remain faithful to the actual claim language and are fully consistent with the specification and the patent's prosecution history.  This Court should adopt Augme's proposed constructions for all disputed terms.

# II.  THE PATENTED TECHNOLOGY

In the late 1990s Web pages consisted mostly of static text and images.  The inventors of U.S. Patent No. 7,831,690 (the "'690 Patent"), the sole patent-in-suit, recognized that numerous benefits could be gained if Web pages had additional functionality, such as the ability to play

---

[1] Giles S. Rich, *The Extent of the Protection and Interpretation of Claims-American Perspectives*, 21 INT'L REV. INDUS. PROP. & COPYRIGHT L. 497, 499 (1990).

streaming media, a nascent technology at the time.[2]  (Ex. 1[3] at 1:51-67.)  The '690 Patent describes and claims an efficient way to provide this expanded functionality in a manner that achieves additional advantages.  First, the added content is delivered through a graphical display that looks and operates like a real world media appliance, such as a radio or a television.  (*Id.* at 5:50-63.)  The result is a "media appliance metaphor," which gives the visitor of the Web page an immediate sense of control over the media content.  (*Id.*)  For example, if the metaphor is of a radio device, then the visitor can adjust the volume and change stations easily because the graphic display looks and behaves like a real-world radio.  (*Id.* at 13:1-7.)

Second, the metaphor that the inventors developed is a service response that is tailored not only to content displayed on the Web page, but also to the visitor's operating environment and preferences.  This ensures that the metaphor can function in diverse operating environments (*Id.* at 10:19-23, 10:66–11:2), allows the metaphor to provide content that is related to content displayed on the Web page (*Id.* at 12:54-67, 8:35-37), and further allows the metaphor to conform to visitor preferences for the content and the look of the metaphor (*Id.* at 11:10-14, 14:24-26.)

In one exemplary embodiment of the invention, when a visitor visits a Web page about Texas cooking, a radio that plays country music appears in connection with the Web page.  (*Id.* at Figs. 4, 11).  The radio metaphor is compatible for display at the visitor's computer and may be displayed at a visitor-defined position, size and/or manner according to his or her preferences.  (*Id.* at 8:41-52, 11:10-14, 12:54-61, Fig. 4.)

---

[2] The '690 Patent claims priority to U.S. Patent Application No. 09/429,357 that was filed on October 28, 1999.

[3] The exhibits referenced in this brief are the exhibits attached to the Declaration of Ankur P. Parekh in Support of Augme's  Claim Construction Brief ("Parekh Decl.") filed concurrently herewith, and will be referred to hereafter as "Exs. 1-8."

There are multiple aspects to the inventors' developments, as evidenced by the fact that the '690 Patent specification also supports three other issued patents. (Exs. 2-4.) While some of those other patents claim code modules that are used to request and deliver service responses that may be metaphors (*See, e.g.,* Ex. 2 at Claim 1), the '690 Patent claims the metaphor itself. The elements in independent claim 1 of the '690 patent include the features mentioned above that make the metaphor so useful, including: (1) the metaphor has a real-world counterpart; (2) it is formed as a service response in response to information received from the visitor's computer; and (3) it is customized according to the information content of the Web page.[4]

## III.  LEGAL PRINCIPLES

"The interpretation and construction of patent claims . . . is a matter of law exclusively for the court." *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 971-72 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Claim terms "'are generally given their ordinary and customary meaning'[, which] is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc). "In some cases, the ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. In other cases, however, the claims include terms that have a particular meaning in a field of art, or the inventors use one or more terms idiosyncratically. *Id.* In such instances, courts examine "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Id.* This includes the "intrinsic" evidence: the claims themselves, the specification, and the prosecution history. *See Vitronics*

_____

[4] Augme refers the Court to the technology tutorial that it filed concurrently with this brief for additional information about the patented technology.

*Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

The claims themselves provide substantial guidance as to the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. For example, the context in which a term is used in the asserted claim can be highly instructive. *Id.* (explaining that the term "steel baffles" in a claim "strongly implies" that "baffles" are not inherently made of steel). Other claims of the patent in question can also shed light as to the meaning of a claim term. *Id. See also Arlington Indus. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1254 (Fed. Cir. 2011). Also, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim. *Phillips*, 415 F.3d at 1314; *see also Voda v. Cordis Corp.*, 536 F.3d 1311, 1320 (Fed. Cir. 2008) (independent claim did not require a portion of the claimed catheter to be straight where dependent claim expressly recited that the portion is straight).

Moreover, patent claims "must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315. For example, "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess." *Id.* at 1316. "In such cases, the inventor's lexicography governs." *Id.* The specification may also "reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.* "In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." *Id*.

While the "claims 'must be read in view of the specification, of which they are a part,'" *id*. at 1315, it is improper to read a limitation from the specification into the claim. *Id*. at 1323.[5]

---

[5] The Federal Circuit has referred to attempts to import a feature of the disclosed embodiments into the claims as a "cardinal sins" of patent law. *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340-41 (Fed. Cir. 2001).

In particular, although the specification often describes very specific embodiments of the invention, the claims are not confined to those embodiments. *Phillips*, 415 F.3d at 1323; *see also Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The claims, not specification embodiments, define the scope of patent protection."); *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994) ("[E]mbodiments appearing in specification will not be read into claims when claim language is broader . . ..").  "[P]ersons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Phillips,* 415 F.3d at 1323.  "[E]ven where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Martek Biosciences Corp. v. Nutrinova, Inc*., 579 F.3d 1363, 1381 (Fed. Cir. 2009).

Further, although the prosecution history may be used to understand the language used in the claims, it cannot "enlarge, diminish, or vary" the limitations in the claims. *Markman*, 52 F.3d at 980.  The prosecution history is less useful for claim construction purposes than the patent itself because it represents an ongoing negotiation between the Patent & Trademark Office and the applicant, not the final product, and it thus lacks the clarity of the final issued patent. *See Phillips*, 415 F.3d at 1317.

Extrinsic evidence, *i.e.*, "all evidence external to the patent and prosecution history" such as dictionaries and expert testimony, may also be useful for claim construction. *Id*. at 1317-19. "[D]ictionaries, and especially technical dictionaries, . . . have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention." *Id.* at 1318.  Expert testimony may be

useful for claim construction as long as it consists of more than just conclusory assertions as to the definition of a claim term and is not "clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history." *Id.* at 1318.

## IV.   ARGUMENT

### 1.   "media appliance metaphor"

| Term | Augme's Construction | Pandora's Construction |
|---|---|---|
| Media appliance metaphor<br><br>(Ex. 1, claims 1-6) | "a software device that exists in the realm of electronic communication and has a counterpart in the real world" | "a software device that exists in the realm of electronic communication and has a physical counterpart object in the real world that can be manipulated on the display screen in the same manner that the physical object is manipulated in the real world" |

Augme proposes that the construction for "media appliance metaphor" should be the definition for the term provided by the '690 Patent specification: "[m]edia appliance metaphor 111 is a software device that exists in the realm of electronic communication and has a counterpart in the real world." (Ex. 1 at 5:50-52.) Augme submits that this definition will be easily understood by a jury and therefore requires no further clarification.

Pandora's proposed construction starts with what is essentially Augme's proposed construction but then improperly requires that the claimed "media appliance metaphor" must be one that "can be manipulated on the display screen in the same manner that the physical object is manipulated in the real world." Neither the claim language nor the specification supports such a requirement. At most, the specification states that the metaphor "is a graphic representation of something that looks and behaves like a media appliance." (*Id.* at 5:54-55.) Thus, the specification discloses that the media appliance metaphor is similar enough in appearance, operation and functionality to provide the visitor with a sense of familiarity. (*See id.* at 5:59-63.) It certainly does not require that the claimed invention must be capable of being manipulated the

exact same way that the real world counterpart is manipulated.

Pandora's proposed construction would seemingly improperly exclude the preferred embodiment of a media appliance metaphor that is depicted in the drawing figures of the '690 Patent. (*See id.* at Fig. 4); *See also MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) ("[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct."). That embodiment is a radio image that is not manipulated in the exact same manner as a real-world radio. For example, unlike a real-world radio, one changes the station of the radio metaphor by using a drop-down menu. (Ex. 1 at 13:1-3, Fig. 4.)

### 2. "Web page"

| Term | Augme's Construction | Pandora's Construction |
|---|---|---|
| **Web page**<br><br>(Ex. 1, claims 1-6) | This term does not require construction beyond its plain and ordinary meaning.<br><br>To the extent, however, that the Court decides to construe the term, Augme proposes:<br><br>"a document or information resource associated with a URL that may be downloaded or accessed from the World Wide Web" | "a document generated in Hypertext Markup Language (HTML) that is accessed through a Web browser and displayed by a Web browser" |

Augme's proposed construction captures the fundamental aspects of a "Web page" as that term is understood in the art and leaves out features that, while associated with many pages, are not required. (*See* Declaration of Alfred C. Weaver Ph.D. ("Weaver Decl.")[6] ¶ 3; Ex. 5 (defining "Web page" as "A document on the World Wide Web. Every Web page is identified by a unique URL (Uniform Resource Locator).").)

---

[6] The Weaver Decl. will be filed concurrently herewith.

Augme's proposed construction is fully consistent with the specification. The specification explains that "Web pages . . . . are access[ed] through the Internet" and/or "download[ed] . . . . at a processor platform." (Ex. 1 at 1:18-20, 7:9-13.) The specification further describes a (URL) that is "used to locate Web page 34 via network 28." (*Id.* at 4:4-6.)

Pandora's proposed construction is incorrect because it incorporates nonessential characteristics of a "Web page," while making no mention of the World Wide Web or a URL. (Weaver Decl. ¶¶ 3-4.) Instead, Pandora seeks to define "Web page" through HTML, even though the specification explains that a Web page created using HTML is merely a preferred embodiment of the invention. (*Id.* at 3:66-4:1.) It is improper to limit a claim element to a preferred embodiment. *Linear Tech. Corp. v. Int'l Trade Comm'n*, 566 F.3d 1049, 1057-58 (Fed. Cir. 2009) (claimed "first state of circuit operation" need not occur at high load currents even though specification disclosed examples where that state occurred at high load currents). Indeed, the specification expressly states that the disclosed embodiments are "to be regarded in an illustrative rather than restrictive sense." (Ex. 1 at 14: 31-33.) While the specification references HTML a number of times, nowhere does the specification use "words or expressions of manifest exclusion or restriction" to restrict the claimed "Web page" to those generated by HTML. *Linear*, 566 F.3d at 1058. Quite the opposite, the specification expressly references JavaScript, a scripting language used to author Web pages. (Ex. 1 at 4:33-36; Weaver Decl. ¶ 15.) Moreover, when the inventors wanted to limit a claim to a Web page generated in HTML, they did so expressly. (*See, e.g.*, Ex. 2 at dependent Claim 4 (reciting that "said Web page is generated in a HyperText Markup Language (HTML)")); *see also Arlington Indus.*, 632 F.3d at 1254 ("spring metal adaptor" element in independent claim need not be "split" where second independent claim expressly recited a "split spring metal adaptor.") This is because HTML is

simply *one* of multiple languages that may be used to create Web pages.  (Weaver Decl. ¶¶ 15-17.)

Pandora's proposed construction also improperly imports a "Web browser" limitation.  First, "Web browser" is a technical term that Pandora does not define, so Pandora's proposed construction is likely to confuse rather than inform a jury.  Second, "Web page" should be defined by what it is, not by one particular manner by which it can be accessed and displayed on a computer screen.  The specification recognizes that the disclosed Web page—identified by reference numeral 34 in Figure 1—is a Web page even before it is downloaded to a visitor's computer and displayed—in the disclosed embodiments—through a browser application.  (Ex. 1 at 3:63-66, Fig. 1.)  Third, while browsers have for some time been the dominant tool used to access and display Web pages, Web pages can be accessed and displayed by computer applications that are not browsers.  (Weaver Decl. ¶ 18.)  The specification recognizes this, explaining, for example, that the disclosed server system—which does not include a browser—is able to download and access Web page 34.  (Ex. 1 at 7:21-25.)  As a browser is *not required* to access and display a Web page, it would be error to import this unnecessary restriction into the term "Web page."

3.     **"adding a media function to a Web page"**

| Term | Augme's Construction | Pandora's Construction |
|---|---|---|
| **adding a media function to a Web page**<br><br>(Ex. 1, claims 1-6) | "providing audio, video, and/or graphic content (i.e. a media function) to a Web page. Examples of 'media function' include, but are not limited to, audio sounds, video images, graphic images, banner ads and/or informational feeds" | "adding a software program to a Web page that adds media content to the Web page" |

The phrase "adding a media function to a Web page" should be construed to mean

"providing audio, video, and/or graphic content to a Web page."  Judge McMahon construed the generic term "function" in claims of a related Augme patent to mean "content" and the relevant claim limitation "adding function to a Web page" to mean "downloading to a Web page content tailored to visitor parameters."  *See Modavox, Inc. v. Tacoda, Inc.*, No. 07cv07088(CM), 2011 U.S. Dist. LEXIS 133273, at *6 (S.D.N.Y Sept. 6, 2011).  Augme believes that these constructions are instructive and helpful to the Court in construing the term at issue here.

The specification supports Augme's position that the claimed "media function" includes the content itself.  (*See* Ex. 1. at 5:41-44 ("Web page display process 110 is performed . . . ***to add function, such as streaming media*** or other media services to Web page 34 . . . ."), 1:51-61 ("[a] recent advance in Web site technology is the addition of ***streaming media***, as well as other more sophisticated ***functional enhancements***, to Web sites."), 14:12-14.)  Thus, the "function" described by the specification is, or at the very least includes, the "streaming media" itself.

Pandora proposes that "adding a media function to a Web page" should be construed as "adding a software program to a Web page that adds media content to the Web page."  Pandora's construction is incorrect for several reasons.  First, it is ambiguous as to whether it encompasses actual media content or just software that plays media content.   But, as explained above, the specification makes clear that the claimed "media function" includes the content itself.  Second, Pandora's proposed construction reads as if the claimed metaphor—which, according to express language in claim 1, is a "software device"—adds additional software that adds media content to a Web page.  Such an interpretation has absolutely no specification support.  If Pandora means that the metaphor is itself the added software, then Pandora's construction is redundant and confusing because the claim already expressly recites that the metaphor is a software device.

#### 4. "processor platform"

| Term | Augme's Construction | Pandora's Construction |
|------|---------------------|------------------------|
| **Processor platform**<br><br>(Ex. 1, claims 1-6) | This term does not require construction beyond its plain and ordinary meaning.<br><br>To the extent, however, that the Court decides to construe the term, Augme proposes:<br><br>"a networked computing device that includes a central processing unit (CPU), memory, and communications ports" | "a networked client-side (i.e. end user) computer device having a processor, memory, including a non-transitory memory, input/output lines, a Web browser and a display device" |

Augme's construction recognizes that the claimed "processor platform" is simply a computer, which necessarily has a CPU and a memory. Augme's construction also states that the claimed "processor platform" is networked, which is consistent with other language in the claim. And because the claimed "processor platform" is networked, Augme's construction references the communication ports that allow for network communication.

This construction is fully consistent with the specification. The specification describes a "first processor platform" and a "second processor platform," which have different sets of features. (Ex. 1 at 3:63-65, 4:13-16, 4:49-54, 5:2-4, Fig. 1.) The components that these two computers have in common, *i.e.*, a CPU, a memory, and network ports, are part of Augme's construction. (*Id.*) Augme's construction does not include features that are only a part of one of these two computers.

Pandora's construction improperly requires the claimed "processor platform" to include "input/output lines, a Web browser and a display device." These are only features of the disclosed second processor platform. (*Id.* at 4:13-17, Fig. 1.) Because the disclosed first processor platform does not include these features, they should not be a part of the construction.

Similarly, the construction should not require "a client-side (*i.e.*, end user) computer," because only the second processor platform is strictly a client-side computer. The first processor platform does not act as a client-side computer when it delivers a Web page to the second processor platform. (*See id.* at 3:63-66, 6:13-18, Fig. 3.)

Pandora's construction is also improper because it includes not just a memory but a "non-transitory memory." Claim 1 recites "A media appliance metaphor residing in a non-transitory memory . . . ." (*Id.* at 14:41-42.) Other language in the claim makes clear that the "non-transitory memory" is at the claimed "server system," not at the "processor platform." (*See* Ex. 1 at 14:48 (reciting that the media appliance metaphor is formed by the server system.)

### 5. "a software device of a graphic representation representing a real world counterpart for display in connection with said Web page"

| Term | Augme's Construction | Pandora's Construction |
|---|---|---|
| **a software device of a graphic representation representing a real world counterpart for display in connection with said Web page**<br><br>(Ex. 1, claims 1-6) | This phrase as a whole does not require construction beyond its plain and ordinary meaning. | "a computer code module that when executed results in a graphic representation of a real world counterpart media device displayed in a Web Page" |

This phrase does not require any further construction. Augme has provided a construction for the term "Web page" should the Court decide to construe it. By including the term "software device" in its construction of "media appliance metaphor," Pandora has admitted that a jury will understand that term. Pandora has also conceded that a jury will understand the terms "graphic representation" and "representing a real world counterpart" because it essentially repeated those terms in its construction for the phrase.[7] The remainder of the phrase uses plain

---

[7] Pandora also essentially repeats the term "representing a real world counterpart" in its proposed construction for "media appliance metaphor." *See* Section IV.1, *supra*.

English words—like "in connection with"—whose meanings are familiar to lay jurors.

Pandora's results-oriented construction is incorrect for multiple reasons. First, while Pandora was content with the term "software device" in its construction of "media appliance metaphor," it seeks to replace that term here with "software code module." *See* Section IV.1, *supra*. But, as the specification recognizes, a "software device" is not the same thing as a "software code module." Rather, the specification teaches that the software device media appliance metaphor is a service response that is included in the disclosed second code module, which is the delivery mechanism for the metaphor. (Ex. 1 at 8:14-17, 12:1-4, 12:18-22.) But this code module is not claimed in the '690 Patent. Where the inventors intended to claim a "code module," they did so expressly. (*See, e.g.,* Ex. 2 at Claim 1 (reciting a "first code module" and a "second code module").) Once again, Pandora improperly seeks to import a limitation from the specification into the claims. *See Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 807 (Fed. Cir. 2007) (claimed "transverse holes" not limited to disclosed perpendicular holes).

Second, Pandora's proposed construction improperly injects the concept of "execution" into this claim element. Claim 1 already recites elsewhere that the claimed metaphor is "executable by said processor platform." (Ex. 1 at 14:43-44.) As such, it would be confusing to a jury if "execution" were made part of the construction of the instant phrase.

Third, Pandora improperly limits the phrase "in connection with a Web page" to "in a Web page." Clearly the plain meaning of "in connection with" is broader than "in" or "inside." Indeed, the specification discloses several embodiments in which the media appliance metaphor is not displayed in a Web page, but rather is displayed in a completely separate window. (*Id.* at 13:9-33, Figs. 11-12.) Pandora's construction is incorrect because it would exclude those latter

embodiments even though they satisfy the plain meaning of "in connection with."  *See Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) ("We normally do not interpret claim terms in a way that excludes disclosed examples in the specification.").

### 6.  "server system"

| Term | Augme's Construction | Pandora's Construction |
|---|---|---|
| **server system**<br><br>(Ex. 1, claims 1-6) | This term does not require construction beyond its plain and ordinary meaning.<br><br>To the extent, however, that the Court decides to construe the term, Augme proposes:<br><br>"a system having one or more computing devices and one or more databases that is connected to a network and that responds to requests from client computers on the network" | "a processor (CPU), a memory, a database structure having Web address database and visitor database, and a server structure for accommodating streaming media server and other media servers" |

A "server" is universally known in the computing arts as a networked computer that responds to requests from client computers on the network.  (*See* Ex. 6 at 430 (defining "server" as "[o]n the Internet or other network, a computer or program that responds to commands from a client"); Ex. 7 at 1905 (defining "server" as "a computer or software package that sends requested information to a client or clients on a network.").)  Numerous courts have similarly construed the term "server."  *See, e.g., Verizon,* 503 F.3d at 1303 ("server" means "a computer system, such as one or more computers and/or devices, that provides services to other computers over a network"); *Hewlett-Packard Co. v. Intergraph Corp.*, No. C 03-2517 MJJ, 2004 U.S. Dist LEXIS 31073 (N.D. Cal., Dec. 20, 2004) ( "server remote from the client computer system" means "a computer that responds to requests from the client computer system through a network

connection").[8]  The specification is fully consistent with these definitions in that the disclosed server system is networked and responds to a request from the networked second processor platform by delivering a second code module that includes a service response.  (Ex. 1 at 4:49-5:4, 6:50-60, Fig. 1.)  No language in the specification evidences any intent by the inventors to depart from the ordinary and customary meaning of "server."

Augme's construction also recognizes that as a practical matter the claimed "server system," which receives information from a processor platform and forms a service response in response to that information, contains a database.  Augme's construction allows for multiple computers and databases because the full claim term is "server system" rather than simply "server."[9]

This construction is fully consistent with the specification.  In particular, the specification discloses an embodiment of the server system that satisfies Augme's construction.  The disclosed server system—identified by reference numeral 26 in Figure 1—has a CPU 62 and at least two databases 68 and 70.  (*Id.* at 4:45-49, Fig. 1.)  And, as mentioned above, the disclosed server system responds to requests from client computer 24 on the network 28.

With its construction, Pandora blatantly seeks to limit the term "server system" to the specific components of the exemplary server system shown in Figure 1.  (*Id.* at 4:45-49.)  For example, Pandora contends that the claimed server system must include not just a database but the very specific "Web address database" and "visitor database" in the disclosed exemplary server system.  This attempt is improper.  *See Kara Tech.*, 582 F.3d at 1347 (Fed. Cir. 2009)

[8]  *See also In re Margolin*, 244 Fed.Appx. 327, 2007 U.S.App. LEXIS 14269 (Fed. Cir. June 15, 2007) (nonprecedential); *Atser Research Techs., Inc. v. Raba-Kistner Consultants Inc.*, No. SA-07-CA-93-H, 2009 U.S. Dist LEXIS 25294 (W.D. Tex. Feb. 27, 2009); *Seven Networks Inc. v. Visto Corp.*, No. 2:05-cv-365, 2006 U.S. Dist. LEXIS 93870 (E.D. Tex. Dec. 29, 2006).

[9] Pandora cannot plausibly argue that "server system," as opposed to "server," warrants a construction that is completely divorced from the ordinary meaning of the term "server."

(claimed "data" not limited to disclosed cryptographic key). No language in the specification evidences an intent to limit claim scope using "words or expressions of manifest exclusion or restriction." *Martek*, 579 F.3d at 1381 (Fed. Cir. 2009). The disclosed embodiments are "illustrative," not "restrictive." (Ex. 1 at 14:31-33.)

Pandora also contends that the claimed server system includes a streaming media server. But Pandora's proposed construction for "adding media function to a Web page" does not require streaming media, only "media content." *See* Section IV.3, *supra*. If, as Pandora concedes, the claimed invention does not require streaming media, it is illogical and improper to import the streaming media server of the exemplary embodiments in the specification into the claims. *See Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1347 (Fed. Cir. 2008) (claim requires only one piece of a two-piece prosthesis to conform to claimed geometric requirements even though in disclosed embodiments both pieces conformed to them).

### 7. "formed by a server system as a service response in response to information provided by said processor platform to said server system"

| Term | Augme's Construction | Pandora's Construction |
|------|---------------------|------------------------|
| **formed by a server system as a service response in response to information provided by said processor platform to said server system**<br><br>(Ex. 1, claims 1-6) | This phrase as a whole does not require construction beyond its plain and ordinary meaning. Augme has provided proposed constructions for the terms "server system," "service response" and "processor platform" that appear in the phrase. | "the processor platform provides (i) the Web address of the downloaded webpage, (ii) Web browser information, and (iii) processor platform information to the server system which uses this information to assemble software code that includes the service response" |

This phrase as a whole does not require an express construction. Augme has provided constructions for the terms "server system," "service response" and "processor platform" that appear in the phrase. The balance of the phrase uses plain English words—such as "formed by" and "information"—the meanings of which are familiar to lay jurors.

The specification depicts the server system forming a service response in response to information provided by the processor platform at, for example, step 230 in Figure 5. In that step, the server system amends a service response, *i.e.*, it forms a new service response, in response to a visitor specified parameter set. (Ex. 1 at 11:32-35, 11:45-51.) That parameter set is obtained using information provided by the disclosed second processor platform. (*Id.* at 11: 7-14.)

Pandora's proposed construction is incorrect for several reasons. First, it equates the claimed "forming" of the service response with the disclosed assembly of the second code module. But in the disclosed embodiments, the service response is formed before the second code module is assembled. (*Compare* Ex. 1 at Fig. 5, step 230 (forming of service response) *with* Ex. 1 at Fig. 5, step 238 (assembling of second code module); *see also* Ex. 1 at 11:63-66 ("Second code module is assembled by accessing the predetermined [service response].").) Pandora is simply relying on the wrong part of the disclosed process as support for its construction.

Pandora would also improperly limit "information" to mean exactly three specific types of information. The specification never states, however, that the service response must be formed in response to all three types of information; nor do the claims or the specification provide that a service response that is formed using only one or two of these types of information or entirely different types of information is excluded from the scope of the claims. Indeed, Pandora's proposed construction improperly excludes the preferred embodiment described above in which the server forms a service response in response to visitor-preference information.

### 8. "automatically provided"

| Term | Augme's Construction | Pandora's Construction |
|------|---------------------|------------------------|
| **automatically provided**<br><br>(Ex. 1, claims 1-6) | This term does not require construction beyond its plain and ordinary meaning. | "provided from the server system without any action by the user" |

The term "automatically provided" requires no express construction. The term uses simple words whose meanings are well within the grasp of lay jurors. It does not have a special meaning in the computer or Internet arts and the inventors did not define the term in the specification. The plain meaning of the term should control.

Pandora's construction is incorrect because it precludes any action by the user. The term "automatically" does not mandate this restriction. (*See* Ex. 8 at 84 (defining "automatic" as "*largely* or wholly involuntary").) A machine can "automatically" perform a task even if there is some human input involved. Thus, in *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225 (Fed. Cir. 2005), the Federal Circuit rejected the accused infringer's argument that "automatically" meant a "process that occurs without human intervention, such that a human does not have the option to intercede and alter the flow of that process."[10] *Id* at 1235.

### 9. "customized by said server in accordance with information content of said Web page"

| Term | Augme's Construction | Pandora's Construction |
|------|---------------------|------------------------|
| **customized by said server in accordance with information content of said Web page**<br><br>(Ex. 1, claims 1-6) | This term does not require construction beyond its plain and ordinary meaning.<br><br>To the extent, however, that the Court decides to construe the | "the server system uses information derived from all publicly accessible characters and words written on a Web page to customize the media appliance metaphor" |

---

[10] The Court gave the example of a dishwasher: "[S]imply because a human has to load [an automatic dishwasher] and press the start button, and has the ability to turn it off mid-cycle, does not mean that the device does not 'automatically' wash the dishes." *Id at 1235. See also Z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1351 (Fed. Cir. 2007) (rejecting proposed construction of "automatically" that precluded user interaction or intervention).

| | term, Augme proposes:<br><br>"tailored by the server system (as construed) to complement or relate to data contained in or otherwise associated with the Web page (as construed)" | |
|---|---|---|

Should the Court decide to construe this phrase, it should adopt Augme's construction. Augme's construction is fully consistent with and supported by the specification. In the preferred embodiment, the radio metaphor is tailored to complement a Web page about Texas cooking by playing country music. (Ex. 1 at 12:54-67, 14:24-26, Fig. 4.) The country music enhances the appeal of the Web page. (*Id.* at 12:58-61.) Thus, the metaphor should relate to some data associated with the Web page so it can enhance the appeal of the Web page when that page is displayed on a computer screen. The specification also discloses other ways in which the metaphor can be customized or tailored to data associated with the Web page. (*Id.* at 8:35-40, 8:49-52.)

Pandora's construction is incorrect for multiple reasons. First, Pandora's construction improperly requires the server system to "use" the claimed "information content of [the] Web page" to customize the metaphor. But the claims only require a metaphor that is customized by the server system ***"in accordance with"*** the information content of the Web page. Pandora's construction improperly excludes disclosed embodiments in which the server system customizes the metaphor "in accordance with" the claimed "information content of [the] Web page" without directly using that information. *See MBO Labs.*, 474 F.3d at 1323. For example, the specification discloses an embodiment in which the server system customizes the metaphor by querying the developer of the Web page. (Ex. 1 at 8:41-48.) The Web developer, of course, knows what the Web page is about and can directly supply the server system with information it can use to customize the metaphor to complement the Web page.

Pandora's construction is also improper because it defines "information content of [the] Web page" too narrowly. Pandora's construction of that term comes from a single sentence in the specification, which Pandora treats as a limitation on the type of information that the metaphor can be customized in accordance with. (*Id.* at 7:29-31.) But the specification is not so limiting. At another location, the specification describes the information content of the disclosed Web page more broadly as "involv[ing] Texas Cooking." (*Id.* at 12:58-64.) Moreover, the sentence in the specification that Pandora relies upon relates to an unclaimed Web page extraction process, not metaphor customization. (*Id.* at 7:26-42.) Additionally, as explained above, the server system in the disclosed embodiments need not even use extracted information, or any other data directly associated with the Web page, when forming a customized metaphor. As such, there is no reason to limit the claimed "information content of [the] Web page" to information obtained from the disclosed extraction process. Data associated with the displayed Web page is "information content of [the] Web page," regardless of whether the data is subject to the disclosed extraction process.

## V.     <u>CONCLUSION</u>

For the foregoing reasons, Augme respectfully requests that the Court adopt its proposed claim constructions.

Dated:  January 6, 2012                                    Respectfully submitted,

/s/ *Edmond D. Johnson*
Edmond D. Johnson (Del. Bar No. 2257)
James G. McMillan, III (Del. Bar No. 3979)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Tel.:  (302) 777-6500
Fax.:  (302)421-8390

*johnsone@pepperlaw.com*
*mcmillanj@pepperlaw.com*

Thomas J. Scott, Jr.
Jennifer A. Albert
GOODWIN PROCTER LLP
901 New York Avenue NW
Washington, DC 20001
Tel.:  (202) 346-4000
Fax:  (202) 346-4444
*jalbert@goodwinprocter.com*
*tscott@goodwinprocter.com*

Ankur P. Parekh
GOODWIN PROCTER, LLP
620 Eighth Avenue
New York, NY 10018-1405
Tel.:  (212) 813-8800
Fax:  (212) 355-3333
*aparekh@goodwinprocter.com*

*Attorneys for Plaintiff Augme Technologies,*
*Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 6, 2012, I caused **Plaintiff Augme Technologies, Inc.'s**

**Opening Claim Construction Brief, Declaration of Ankur P. Parekh in support of Plaintiff's**

**Opening Claim Construction Brief, and Declaration of Alfred C. Weaver, Ph.D. in support**

**of Plaintiff's Opening Claim Construction Brief**, to be electronically filed with the Clerk of the

Court using CM/ECF, which will send notification to the following counsel of record:

> Rodger D. Smith II, Esq.
> MORRIS, NICHOLS, ARSHT & TUNNEL LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899

I further certify that I caused copies of the foregoing documents to be served on January 6, 2012, upon the following in the manner indicated:

Jack B. Blumenfeld, Esq.                                     *VIA ELECTRONIC MAIL*
Rodger D. Smith II, Esq.
MORRIS, NICHOLS, ARSHT & TUNNEL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
*jblumenfeld@mnat.com*
*rdsefiling@mnat.com*


J. Pieter Van Es, *pro hac vice*                             *VIA ELECTRONIC MAIL*
Matthew P. Becker, *pro hac vice*
Richard S. Stockton, *pro hac vice*
Azuka C. Dike, *pro hac vice*
BANNER & WITCOFF, LTD.,
Ten South Wacker Drive, Suite 3000
Chicago, IL 60606
*pvanes@bannerwitcoff.com*
*mbecker@bannerwitcoff.com*
*rstockton@bannerwitcoff.com*
*adike@bannerwitcoff.com*

> <u>/s/ *Edmond D. Johnson*</u>
> Edmond D. Johnson (#2257)