IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AUGME TECHNOLOGIES, INC., | : |
| Plaintiff, | : |
| v. | : C.A. No. 11-379-LPS |
| PANDORA MEDIA, INC., | : |
| Defendant. | : |

Edmond D. Johnson, Esquire and James G. McMillan, III, Esquire of PEPPER HAMILTON LLP, Wilmington, DE.

Of Counsel: Thomas J. Scott, Jr., Esquire and Jennifer A. Albert, Esquire of GOODWIN PROCTER LLP, Washington, DC.

    Attorneys for Plaintiff.

Jack B. Blumenfeld, Esquire, Rodger D. Smith II, Esquire, and Jeremy A. Tigan, Esquire of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE.

Of Counsel: Matthew P. Becker, Esquire, Richard S. Stockton, Esquire, and Azuka C. Dike, Esquire of BANNER &WITCOFF, LTD, Chicago, IL.

    Attorneys for Defendant.

**MEMORANDUM OPINION**

December 5, 2012
Wilmington, Delaware.

*[signature]*

**STARK, U.S. District Judge**:

## I. INTRODUCTION

Plaintiff Augme Technologies, Inc. ("Plaintiff" or "Augme") filed suit against defendant Pandora Media, Inc. ("Defendant" or "Pandora") on April 29, 2011, alleging infringement of United States Patent No. 7,831,690 ("the '690 patent" or "patent-in-suit"), entitled "Appliance Metaphor For Adding Media Function To A Web Page." (Docket Item ("D.I.") 1)[1] The '690 patent contains one independent claim and five dependent claims, all of which are directed towards a software device and are asserted against Pandora.

The parties dispute nine terms, all of which appear in independent claim 1 and are highlighted below:

> A *media appliance metaphor* residing in non-transitory memory for *adding a media function to a Web page* downloaded at a *processor platform*, said metaphor executable by said *processor platform*, and comprising *a software device of a graphic representation representing a real world counterpart for display in connection with said Web page*, wherein said metaphor is:
>
> *formed by a server system as a service response in response to information provided by said processor platform to said server system*;
>
> *automatically provided* from said *server system* when said *Web page* is downloaded at said *processor platform*;
>
> *customized by said server system in accordance with information content of said Web page.*

---

[1] The '690 patent is a divisional of "Method and Code Module For Adding Function To A Web Path," now U.S. Patent No. 7,269,636 ("the '636 patent"), which is a continuation of "Method And System For Adding Function To A Web Page," now U.S. Patent No. 6,594,691 ("the '691 patent"). The '690 patent may be found at D.I. 37 Ex. B.

The Court held a Markman hearing on February 27, 2012. (*See Markman* Hr'g Tr., Feb. 27, 2012 (D.I. 68) (hereinafter "Tr.")) The Court now provides its constructions.[2]

## II. LEGAL STANDARDS

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted). Construing the claims of a patent presents a question of law. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 388-90 (1996). "[T]here is no magic formula or catechism for conducting claim construction." *Phillips*, 415 F.3d at 1324. Instead, the court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). The patent specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular

---

[2]The parties have agreed on certain constructions, which the Court will adopt. The agreed-upon constructions are included in the Court's Order being issued today.

claim terms," the context of the surrounding words of the claim also must be considered. *Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are normally used consistently throughout the patent . . . ." *Id.* (internal citation omitted).

It is likewise true that "[d]ifferences among claims can also be a useful guide . . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. It bears emphasis that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (internal quotation marks omitted), *aff'd*, 481 F.3d 1371 (Fed. Cir. 2007).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman*, 52 F.3d at 980. The prosecution history, which is "intrinsic evidence," "consists of the complete record of the proceedings before the PTO [Patent

3

and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

A court also may rely on "extrinsic evidence," which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the court in determining the meaning of a term to those of skill in the relevant art because such dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. In addition, expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of ordinary skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, while extrinsic evidence "may be useful" to the court, it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19.

Finally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows

that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007).

## III. CONSTRUCTION OF DISPUTED TERMS

### A. "media appliance metaphor" (claims 1-6)

> Plaintiff's Proposed Construction: "a software device that exists in the realm of electronic communication and has a counterpart in the real world"
>
> Defendant's Proposed Construction: "a software device that exists in the realm of electronic communication and has a physical counterpart object in the real world that can be manipulated on the display screen in the same manner that the physical object is manipulated in the real world"
>
> Court's Construction: "a software device that exists in the realm of electronic communication and has a counterpart in the real world"

Augme's proposed construction directly tracks the specification, which states: a "[m]edia appliance metaphor 111 is a software device that exists in the realm of electronic communication and has a counterpart in the real world." ('690 patent, col.5 ll.50-52) Pandora's proposal begins with this portion of the specification but adds the limitation that the media appliance metaphor "can be manipulated on the display screen in the same manner that the physical object is manipulated in the real world." This additional limitation is not warranted.

Pandora's proposed construction appears to exclude the preferred embodiment of a media appliance metaphor depicted in at least one of the figures of the '690 patent. For example, Figure 4 shows a radio image that is not manipulated in precisely the same manner as a real-world radio. Unlike a real-world radio, in which one might change a station by turning a knob or dial, in the "radio" depicted in Figure 4 one changes the station by use of a drop-down menu. (*See* '690 patent col.13 ll.1-3; *id.* Fig. 4) "[A] construction that excludes a preferred embodiment is rarely,

5

if ever, correct." *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 865 (Fed. Cir. 2004) (internal quotation marks omitted).

**B.     "Web page" (claims 1-6)**

<span style="margin-left: 2em;">Plaintiff's Proposed Construction: This term does not require construction beyond its plain and ordinary meaning. Alternatively, "a document or information resource associated with a URL that may be downloaded or accessed from the World Wide Web"</span>

<span style="margin-left: 2em;">Defendant's Proposed Construction: "a document generated in Hypertext Markup Language (HTML) that is accessed through a web browser and displayed by a web browser"</span>

<span style="margin-left: 2em;">Court's Construction: "a document or information resource associated with a URL that may be downloaded or accessed from the World Wide Web"</span>

As an initial matter, the Court concludes that it must construe this disputed term, notwithstanding Augme's assertion that no construction is necessary.[3] The parties do not agree on the meaning of the disputed term and their dispute appears to be material. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."). While district courts are not required to engage in an exercise of redundancy, nor to construe every limitation in a claim, when the parties do present a fundamental dispute regarding the scope of a claim term, "it is the

---

[3]*But see Accolade Sys. LLC v. Citrix Sys., Inc.*, 634 F. Supp. 2d 738, 753 (E.D. Tex. 2009) ("[T]he Court does not construe 'web page.' The definition for 'web page' provided in the specification is consistent with the web page that is commonly known to a layperson. As such, lay jurors would be familiar with 'web page,' and a construction is not necessary. Furthermore, using the definition for 'web page' provided in the specification would only lead to confusion about an already well understood term.").

court's duty to resolve it." *Id.*[4]

Here, Augme's proposed construction of "Web page" captures the essential features of the term as it is used in the art, whereas Pandora's proposal adds non-essential characteristics. (*See* D.I. 43 Decl. of Alfred C. Weaver, Ph.D., ¶¶ 12-14) Augme's construction is consistent with the specification, which (i) explains that: "Web pages . . . are access[ed] through the Internet" and/or "download[ed] . . . at a processor platform" ('690 patent col.1 ll.18-20; *id.* at col.7 ll.9-13) and (ii) describes a URL that is "used to locate Web page 34 via network 28" (*id.* at col.4 ll.4-6).

Pandora has not offered persuasive support for its criticism of Augme's proposal as overbroad. By contrast, Pandora's proposed construction is too narrow, limiting "Web page" to a document generated in HTML, even though the patent describes HTML as merely a preferred embodiment of the invention. (*See id.* at col.3 l.66 – col.4 l.1 ("***In a preferred embodiment***, Web page 34 is generated in [HTML].") (emphasis added)) While the specification references Web pages generated by HTML, it also references JavaScript, another language with which Web pages may be created. (*See id.* at col.4 ll.33-36) Pandora also limits how one may access and display a Web page to only through a Web browser, but the specification recognizes that Web pages can be accessed and displayed by other types of computer applications. (*See, e.g., id.* at col.7 ll.21-25 ("Registration subprocess 132 begins with a task 134. Task 134 causes server system 26 (FIG. 1) to retrieve Web page 34. Task 134 may also causes [sic] server system 26 to retrieve Web pages (not shown) that are nested in association with Web page 34."))

---

[4]Sometimes a claim construction dispute may be resolved without adopting a construction of the disputed term other than "plain and ordinary meaning." *See, e.g., Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365-66 (Fed. Cir. 2012).

7

### C. "adding a media function to a Web page" (claims 1-6)

Plaintiff's Proposed Construction: "providing audio, video, and/or graphic content (i.e. a media function) to a Web page. Examples of 'media function' include, but are not limited to, audio sounds, video images, graphic images, banner ads and/or informational feeds"

Defendant's Proposed Construction: "adding a software program to a Web page that adds media content to the Web page"

Court's Construction: "adding a software program to a Web page that adds media content to the Web page"

The specification indicates that the claimed "media function" includes the content itself. (*See* '690 patent col.5 ll.41-44 ("Web page display process 110 is performed . . . to add function, such as streaming media or other media services to Web page 34 . . . ."); *id.* at col.1 ll.51-61 ("A recent advance in Web site technology is the addition of streaming media, as well as other more sophisticated functional enhancements, to Web sites."); *id.* at col.14 ll.12-14) The parties agree that the media function includes content but disagree on whether it also requires software. On this issue, the Court agrees with Pandora: in the context of the patent-in-suit, software is required. (*See id.* at col.2 ll.1-4 ("A typical example of adding function to a Web site is the addition of an 'affiliate' program. An affiliate program, provided by a third party may be desired by the Web site developer to add functionality to their Web site . . . ."); *see also id.* at col.5 ll.45-49, col.7 ll.54-58; col.10 ll.54-57; col.14 ll.12-16)

### D. "processor platform" (claims 1-6)

> Plaintiff's Proposed Construction: This term does not require construction beyond its plain and ordinary meaning. Alternatively, Augme proposes "a networked computing device that includes a central processing unit (CPU), memory, and communications ports"
>
> Defendant's Proposed Construction: "a networked client-side (i.e. end user) computer device having a processor, memory, including a non-transitory memory, input/output lines, a Web browser and a display device"
>
> Court's Construction: "a networked computing device that includes a central processing unit (CPU), memory, and communications ports"

As an initial matter, the Court concludes that the parties have a material dispute as to this term which must be resolved through construction. *See O2 Micro*, 521 F.3d at 1362.

Augme's proposed construction recognizes that the claimed "processor platform" is: (i) simply a computer, necessarily containing a CPU and a memory, (ii) that is networked, thus requiring communication ports to allow for network communications. The patent specification describes two processor platforms, a first and a second, each with different features. Augme's construction is consistent with the specification in that it contains the features common to both processor platforms, i.e., a CPU, a memory, and network ports. (*See* '690 patent col.3 ll.63-65; *id.* at col.4 ll.13-16, 49-54; *id.* at col.5 ll.2-4; *id.* Fig. 1) Pandora's proposal, however, improperly adds, for example, the requirements of: (i) "input/output lines, a Web browser and a display device," which are features only of the disclosed *second* processor platform; and (ii) a "client-side (i.e., end user) computer," although only the *second* processor platform is strictly a client-side computer. (*See id.* at col.4 ll.13-17)

9

**E.     "a software device of a graphic representation representing a real world counterpart for display in connection with said Web page" (claims 1-6)**

> Plaintiff's Proposed Construction: This phrase as a whole does not require construction beyond its plain and ordinary meaning. Augme has provided a proposed construction for the term "Web page" that appears in the phrase.
>
> Defendant's Proposed Construction: "a computer code module that when executed results in a graphic representation of a real world counterpart media device displayed in a Web Page"
>
> Court's Construction: No construction necessary.

The Court agrees with Augme that, having already construed the term "Web page," it is not necessary to provide any separate construction of this larger term. The Court further agrees with Augme that Pandora's proposed construction "confuses what the media appliance metaphor is with one embodiment for how it is displayed on the screen;" the term, however, "does not and need not address how the metaphor gets displayed on a computer screen." (D.I. 46 at 12-13)

**F.     "server system" (claims 1-6)**

> Plaintiff's Proposed Construction: This term does not require construction beyond its plain and ordinary meaning. Alternatively, Augme proposes "a system having one or more computing devices and one or more databases that is connected to a network and that responds to requests from client computers on the network"
>
> Defendant's Proposed Construction: "a processor (CPU), a memory, a database structure having Web address database and visitor database, and a server structure for accommodating streaming media server and other media servers"
>
> Court's Construction: "a system having one or more computing devices and one or more databases that is connected to a network and that responds to requests from client computers on the network"

The Court concludes that the parties have a material dispute as to this term which must be resolved through construction. *See O2 Micro*, 521 F.3d at 1362.

Augme's construction, which the Court adopts, is consistent with the specification, which

10

discloses a server system that is networked and responsive to requests from the networked second processor platform by delivering a second code module that includes a service response. (*See* '690 patent col.4 1.49 – col.5 1.4; *id.* at col.6 ll.50-60; *id.* Fig. 1) This construction is further supported by the dictionaries and judicial decisions Augme cites for the proposition that "server" is "universally known in the computing arts as a networked computer that responds to requests from client computers on the network." (D.I. 41 at 14-15)

Pandora, by contrast, would limit the "server system" to the exemplary server system disclosed in the patent. (*See* '690 patent Fig. 1; *see also id.* at col.4 ll.45-49) Pandora unpersuasively seeks to limit the disputed term to particular components of the exemplary system (*e.g.*, not just a database but a "Web address database" and "visitor database;" not just a server but a "streaming media server").

> **G.** **"formed by a server system as a service response in response to information provided by said processor platform to said server system" (claims 1-6)**
>
> Plaintiff's Proposed Construction: "This phrase as a whole does not require construction beyond its plain and ordinary meaning. Augme has provided proposed constructions for the terms 'server system,' 'service response' and 'processor platform' that appear in the phrase."
>
> Defendant's Proposed Construction: "the processor platform provides (i) the web address of the downloaded webpage, (ii) web browser information, and (iii) processor platform information to the server system which uses this information to assemble software code that includes the service response"
>
> Court's Construction: No construction necessary.

The Court agrees with Augme that, having already construed the terms "server system," "service response," and "processor platform," it is not necessary to provide any separate construction of this larger term. The Court further agrees with Augme that the prosecution

11

history argument made by Pandora is unavailing, particularly as it is based on prosecution of a different patent involving a different claim term. (*Compare, e.g.*, D.I. 40 at 17 (Pandora arguing that prosecution of '636 patent supports Pandora's proposed construction here) *with* D.I. 46 at 16 (Augme responding that claim term at issue in '636 patent was "assembling . . . said second code module," while no claim of '690 patent recites such assembly))

### H. "automatically provided" (claims 1-6)

Plaintiff's Proposed Construction: This term does not require construction beyond its plain and ordinary meaning.

Defendant's Proposed Construction: "provided from the server system without any action by the user"

Court's Construction: Plain and ordinary meaning.

The dispute here is whether "automatically provided" necessarily excludes any human intervention, as Pandora contends. The Court concludes that, in the context of the patent-in-suit, "automatically provided" does not have such a limited meaning. Pandora has not cited persuasive support for excluding all human intervention. *See generally CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1235 (Fed. Cir. 2005) (rejecting accused infringer's argument that "automatically" meant "process that occurs without human intervention, such that a human does not have the option to intercede and alter the flow of that process").

### I. "customized by said server in accordance with information content of said Web page" (claims 1-6)

Plaintiff's Proposed Construction: This term does not require construction beyond its plain and ordinary meaning. Alternatively, Augme proposes "tailored by the server system (as construed) to complement or relate to data contained in or otherwise associated with the Web page (as construed)"

>Defendant's Proposed Construction: "the server system uses information derived from all publicly accessible characters and words written on a Web page to customize the media appliance metaphor"
>
>Court's Construction: "tailored by the server system (as construed) to complement or relate to data contained in or otherwise associated with the Web Page (as construed)"

The Court concludes that the parties have a material dispute as to this term which must be resolved through construction. *See O2 Micro*, 521 F.3d at 1362. Augme's proposed construction is supported by the specification. For example, in the preferred embodiment, the radio metaphor is tailored to complement a Web page about Texas cooking by playing country music. (*See* '690 patent col.12 ll.54-67; *id.* at col.14 ll.24-26; *id.* Fig. 4) Moreover, the country music enhances the Web page's appeal. (*See id.* at col.12 ll.58-61) The specification discloses other ways in which the metaphor can be customized or tailored to data associated with the Web page. (*See id.* at col.8 ll.35-40, 49-52)

Pandora's proposal, by contrast, appears to exclude disclosed embodiments in which the server system customizes the metaphor "in accordance with" the claimed "information content of [the] Web page" without directly "using" that information. (*See id.* at col.8 ll.41-48) The Court does not agree with Pandora that the patentee defined "information content of Web page" in the specification. (*See id.* at col.7 ll.27-30) ("The information content of Web page 34 ***is derived from*** all characters and words that are written on Web page 34, and that are publicly accessible.") (emphasis added)

## IV. CONCLUSION

For the reasons given above, the Court will construe the terms of the patent-in-suit consistent with this Memorandum Opinion. An appropriate Order will be entered.

13